(No. 23033

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES WEINBERG, Plaintiff in Error.

*Opinion filed October 24, 1935—Rehearing denied Dec. 4, 1935.*

JAMES M. BURKE, and GEORGE M. CRANE, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, HENRY E. SEYFARTH, RICHARD H. DEVINE, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. CHIEF JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was convicted in the criminal court of Cook county of the statutory charge of receiving stolen property and brings the cause here for review. With him were indicted Eula Weinberg, his wife, and Robert Vestal and his wife, Helen Vestal. The indictment consisted of three counts. Two charged burglary and larceny, while the third charged receiving stolen property. The People dismissed the charges against Helen Vestal after the jury were impaneled and proceeded against Eula Weinberg and Robert Vestal on the burglary charge and against plaintiff in error on the charge of receiving stolen property. Eula Weinberg and Robert Vestal were acquitted.

On the night of June 13, 1934, between 11:00 o'clock P. M. and 4:00 o'clock the next morning, jewels stipulated

to be of the value of $64,790 were stolen from one Lottie Zukor in a hotel in the city of Chicago. Though the doors of her rooms were locked when she retired, someone entered the rooms and stole the jewels. Plaintiff in error admits he had possession of them at 2:00 o'clock A. M., June 14. The evidence of the People is that some ten days after the robbery plaintiff in error went to the office of one Nat Ruvell, an attorney at law, and asked him if he heard about the Zukor jewel robbery, and Ruvell having answered that he had seen an account of it in the paper, Weinberg said, "I want to retain you as my attorney to return the jewelry to the insurance company." Ruvell then asked him if he had the jewelry, and Weinberg said, "No, but I can get it." He told Ruvell that three jewel thieves had trailed Lottie Zukor from New York to Chicago, and that he, Weinberg, had noticed in the newspaper that a reward had been offered and he wanted Ruvell to return the jewelry for the reward. Ruvell asked him if he had participated in the robbery, and he said he had not. Ruvell testified that he told Weinberg that he, Ruvell, would have to consult somebody who knew more about how those things were done; that he consulted with one Francis Healy, an attorney for the Chicago Jewelers' Association, who told him he would get in touch with the insurance company and let him know. Negotiations followed, in the course of which Weinberg, through Ruvell, first described a clasp of a necklace which was a part of the stolen jewelry, then produced a lorgnette for identification and later brought the entire package of jewels to Ruvell's office. Ruvell took it to Healy's office and later to the Palmer House, where they met a representative of the insurance company and later the police. Weinberg was placed under arrest. The arrest occurred on July 14, 1934.

Clarence L. Converse, an inspector for the United States Treasury Department, testified that when arrested Weinberg told the officers that "two tough dagoes from

Kansas City had come and put rods" on him and demanded that he get rid of the jewelry; that he had gotten the jewelry some time in the early part of July, and had asked Ruvell, who he said was his cousin, to help him return it to the insurance company. Thomas Alcock, a police officer, corroborated the testimony of Converse. Ruvell denied relationship with Weinberg and said he had known him a little less than a year. Subsequent to the arrest of Weinberg, Robert Vestal and his wife and Eula Weinberg were taken into custody. According to the People's evidence Helen Vestal at that time stated that on the morning of June 14 she had been called by Mrs. Weinberg and plaintiff in error to their rooms, which adjoined hers, and shown the jewels. The People's evidence also is that Robert Vestal, when arrested, stated to the officers that he had been rooming at the same place with the Weinbergs, and that Helen Buck, whom he later married, also roomed there; that they were married on July 2, 1934, and went to Lake Geneva on their honeymoon; that on July 4 Vestal received a call from Weinberg asking him to return to Chicago at once, and that when he returned Weinberg told him he wanted him to rent a safety box and put a package away, advising that he rent it in some name other than his own. He stated that this was done, and that twice after that time Weinberg had called him by telephone about the package. The first time Weinberg asked him to get the eye-glasses from the package, and later he was told to get the entire package and deliver it to Ruvell, and that he did so. His testimony was substantially as his statement to the officers. He testified he did not know what was in the package until he opened it.

Plaintiff in error testified that he was on June 13, 1934, the operator of a night club known as "The 500 Club," on North Clark street; that he was at his place from 7:00 o'clock on the evening of the 13th until 5:30 on the morning of the 14th and that he did not leave during that time;

that about 2:00 o'clock on the morning of the 14th two women came into his place and sat down at a table and ordered beer; that he, Weinberg, went down to the floor below, and when he returned the women were gone and that he found the purse containing the Zukor jewels on a chair near one occupied by one of the women; that he asked one of his bar-tenders if the women had said anything about coming back, and told him that in case they did and inquired about a purse to send them down-stairs to see him. He testified that he took the purse downstairs and put it away in a secret place in the basement and took it home with him the next morning; that the next day he took it back and kept it at the premises until the following Sunday, when he took it home and put it under some shirts in his dresser drawer until he turned it over to Vestal, to be put into a safety box. Though he testified that he did not know of the Zukor robbery until June 23, he also testified that he watched the papers from the time he found the articles to see whom they belonged to, and that by the 22d or 23d of June he made up his mind that the jewels he had were the Zukor jewels, and that he then went to Ruvell, his attorney, for the purpose only of returning them and securing the reward. He denied having told the officers that "two tough dagoes" forced him to take the jewelry. His explanation for asking Vestal to put the jewelry in a safety box under an assumed name was that he, Weinberg, was moving from the place where he had been conducting his club and was afraid that judgments might be entered against him. Explaining why he thus treated the jewels as his own by keeping them beyond the reach of creditors, he testified that he considered them his as he had found them.

One Daniel Kerwin, a friend of Weinberg, testified that he was at the 500 Club on the night of the 13th until 5:00 o'clock on the morning of the 14th; that he saw two women come into the place about 2:00 o'clock in the morn-

ing; that he saw drinks served to them and that they left without touching their drinks; that after they left, Weinberg went to the table the ladies had occupied, pushed the chairs under and then came over to talk to him. He did not testify either that he saw .Weinberg pick up a purse or have one in his possession or that Weinberg said anything to him about picking up a purse, though he had stated that he was facing and so close to the table where the two women sat that he could not help seeing them.

One Daniel Keller testified that he was part owner of the club and that Weinberg was at the club from about 8:00 o'clock on June 13 until 5:30 the next morning; that he saw two women enter the club and stay a few minutes, and that, after they left, Weinberg told him if they came back and said anything about a purse to send them down to him.

Plaintiff in error's first contention is that he was not proved guilty of the charge of receiving stolen property, and his counsel argue that if the testimony shows any guilt it is that of larceny or burglary on his part, and that there was no testimony that he had received stolen property or that it was stolen by any other person. There is no evidence in the record that Weinberg stole the property. His own statement, and the statement of his witnesses, that he was constantly at the 500 Club from 7:00 or 8:00 o'clock on the night of the robbery until 5:00 o'clock the next morning shows that it was impossible for him to have committed the theft. He also told his lawyer that three jewel thieves followed Mrs. Zukor from New York to Chicago, and that he, Weinberg, did not have anything to do with the jewelry and did not have the jewelry but could get it. If the officers' testimony is to be believed he told a different story to them as to how he procured possession of it. He told the chief of police, at the detective bureau, that he found it in his night club on a table, while on the trial he testified he found it on a chair. There is no question but

that the jewels were stolen. The theft of the jewels is amply established. The record shows that the theft was committed by someone other than Weinberg.

Plaintiff in error next contends that there is no evidence that he received the stolen property, or that he knew the property was stolen when he received it, or that he received it for his own gain. As Weinberg testified that he had the jewelry in his possession, considered it his property and had it put in a safety box by another person under an assumed name, it is evident that he received it and intended to gain by the possession of it. That he knew it to be stolen is shown by his own statement to the police of the appearance of two men who compelled him to receive it for the purpose of disposing of it, and his learning, as he says, about ten days after the robbery, who owned the jewels. An examination of the evidence of the various witnesses for the defense shows numerous inconsistencies which we would not be justified in setting out in this opinion. It is sufficient to say that there was ample evidence to support the verdict of the jury that plaintiff in error received this property for his own gain knowing it to have been stolen. Cases cited by counsel do not control, as the facts were not as disclosed in this case. The evidence here meets the requirements of the rule as laid down in *People* v. *Ensor,* 310 Ill. 483, and *People* v. *Dalke,* 336 id. 446.

Counsel for plaintiff in error also argue that the court erred in instructing the jury regarding the law as to an accessory, and that while the instruction was correct as an abstract proposition of law, there is no evidence in this record on which to base it. Vestal had been indicted with Weinberg, and the theory of the People was that Vestal was an accessory. It was proper, therefore, that the jury be instructed as to the law concerning accessory. It was limited to Vestal and was not improper.

It is also complained that three instructions defining circumstantial evidence were given, and that this resulted in emphasizing circumstantial evidence in such a way as to mislead the jury. While it is true that most of the evidence against plaintiff in error was direct, there were circumstances, as shown by the record, which the jury properly considered in determining his guilt or innocence. There was no error in these instructions.

It is next argued that it was error to overrule plaintiff in error's motion in arrest of judgment because the third count on which he was convicted charged a multiplicity or duplicity of offenses, in that it charged him with receiving property for his own gain and to prevent the owner from possessing the same. There was no motion to quash the indictment. Such objection to the indictment goes to the form, and may not be raised on motion in arrest of judgment where no motion to quash is filed. *People* v. *Jones,* 291 Ill. 52; *People* v. *Kingcannon,* 276 id. 251; *Long* v. *People,* 102 id. 331.

It may be further observed that the indictment in this case was not open to the frailties claimed. Paragraph 492 of the Criminal Code as set out in Smith's Statutes of 1933, under which plaintiff in error was convicted, defines the crime of receiving stolen property, and in so doing sets out the different acts by which one may be guilty of that crime. Such a statute creates but a single offense, and the indictment may charge the defendant with committing any or all of the acts as one offense. *People* v. *Reed,* 287 Ill. 606; *Blemer* v. *People,* 76 id. 265.

There is no error in this record requiring reversal, and the judgment of the criminal court is affirmed.

*Judgment affirmed.*